OPINION OF THE COURT
Joseph M. White, J.
This matter came before this court on the complaint of a Greenburgh resident, John McDonald, who alleges in a series of six summonses, the first issued against the defendant on December 24, 1977, that the defendant, Curry Chevrolet Sales and Services, Inc., is guilty of violation of two town noise ordinances (per ch 38, § 4, subd c; ch 57, § 2, subd b).
Subdivision c of section 4 of chapter 38 of the Greenburgh Town Code under the caption of "Noise Law” states:
"38-4 Prohibited Noises:
"The Following acts, among others, are declared to be loud, disturbing and unnecessary noises in violation of this local law but any enumeration herein shall not be deemed to be exclusive:
"c. The keeping of any animal or bird which by causing frequent or long continued" noise shall disturb the comfort and repose of any person in residence.”
Chapter 57 of the Town Code is entitled "Unnecessary Noise” and states:
"57-2 Prohibited acts and conduct:
"It shall be unlawful for any person to wilfully do or cause or allow to be done any of the following acts:
"B. Animals. To harbor a crowing rooster or other noisy animal, including dogs, the crowing, the noise or barking of which annoys, injures or endangers the comfort, repose, health or safety of others, between the hours of 11:00 p.m. and 7:00 a.m.”
In addition to the above-quoted ordinances, it is necessary to quote subdivision A of section 2 of chapter 57:
"It shall be unlawful for any person to willfully do or cause or allow to be done any of the following acts:
*301 "A. Unnecessary noises generally. To make or cause to be made any unnecessary or unusual noise between the hours of 11:00 p.m. and 7:00 a.m., which annoys, injures or endangers the comfort, repose, health or safety of others, or to make or cause to be made between the said hours, whether in the operating of any machine or the exercise of any trade or calling or otherwise, any noise which annoys, injures or endangers the comfort, repose, health or safety of others, unless the making of same be necessary for the protection or preservation of property or of the health, safety, life or limb of some person.” (Emphasis supplied.)
The court has underlined the part stating "unless the making of the same be necessary for the protection or preservation of property” for the court believes that since both ordinances are noise ordinances any inconsistencies in one ordinance as against the other must be, by settled case decisional law, construed against the maker and in favor of the defendant who is criminally charged for any violations of the two chapters.
FACTUAL BACKGROUND
Curry Chevrolet Sales and Services, Inc., is an authorized Chevrolet automobile franchised dealer with premises located at 728 Central Avenue in Scarsdale, New York. The nature of the business is the sales and servicing of new and used automobiles. The premises occupy an area 2.7 acres in size and is a taxpayer of commercial property in the Town of Greenburgh. The premises are composed of building structures consisting of a showroom and a large service department with a shed for the exposition of used cars. The unimproved area is mostly reserved for storage of new and used cars and is to the rear of the building structure. The rear portion of the property line (generally easterly) abuts the property line of residential premises on Robin Hill Road. The Southeasterly portion of the Curry premises rises sharply to the adjoining residential property lines. The area is entirely enclosed by a five-foot chain line fence with the exception of a portion fronting on Central Avenue utilized for the exposition of used automobiles. The chain line fence is screened in most areas abutting the residential property.
The Curry premises were constructed in 1955 and 1956 and opened for business in September of 1956 and Curry Chevrolet Sales and Services, Inc., has been in constant operation as an *302 automobile sales and service establishment since that date. The property fronts on the main thoroughfare in the Town of Greenburgh known as Central Avenue and all means of ingress and egress to the business is off Central Avenue.
The court understands that many of the residential structures on Robin Hill Road and the surrounding area were built after the establishment of the Curry automobile dealership. In particular, the McDonald residence, known as 31 Robin Hill Road, was constructed directly behind the dealership on or about 1977.
At a hearing conducted by this court on March 8, 1978, the defendant testified that between 1956 and 1970 and particularly in the late 1960’s, the dealership experienced numerous incidents of theft, vandalism and malicious mischief to its automobiles in both the fenced area and the unfenced area fronting Central Avenue. At that time the dealership was insured against such losses. The losses became so' significant and the resulting insurance premiums so astronomical that a business solution was required to alleviate the expense. From a business standpoint this expense as well as others was an item of cost eventually passed to the consumer. Various methods of controlling this expense were reviewed. They included the hiring of guard personnel, the installation of various type alarm systems and the use of guard dogs. The idea of guard personnel was discarded because of prohibitive costs. The idea of alarm systems was discarded because of its unreliability and the excessive noise created by triggering the system. The remaining solution was implemented in approximately 1970 by the purchase of three trained dogs at a cost exceeding $2,800. A kennel was erected in the center of the premises and the guard dogs were released within the fenced area during nonbusiness hours. The end result according to the defendant was the immediate cessation of all incidents of theft, vandalism and malicious mischief. The defendant states that the Greenburgh Police Department was instrumental in suggesting the guard dog solution since the constant incidents referred to required numerous paperwork and continued surveillance of the property during nonbusiness hours.
The complainant, John McDonald, purchased a home at 31 Robin Hill Road on or about November 25, 1977. As stated above, the Curry rear boundary abuts residential premises on Robin Hill Road and this court, during a personal visit to the area on August 21, 1978, ascertained that the rear of the *303 property of the complainant, John McDonald, ends at the rear chain link fence of the defendant. Testimony and documents submitted by Mr. McDonald indicate that he, prior to the purchase of his home, was concerned about the possibility of the Curry dogs barking and made inquiries both generally and of Curry as to the barking incidence of the three guard dogs.
Shortly after moving in, Mr. McDonald, annoyed and upset by barking from these guard dogs, proceeded to complain of the barking on a regular basis to the Greenburgh Police and to the management of Curry Chevrolet. According to Mr. McDonald’s testimony and as indicated through his own handwritten time and date log, he complained to the local police over one hundred times prior to this problem being heard by this court. In his complaints against the defendants, Mr. McDonald has solicited and gained the support of other neighbors who apparently are longer time residents in this area then he is. However, the greatest majority of such neighbors seem not to have complained, or did so rarely, before Mr. McDonald’s solicitation of their help.
Mr. McDonald has stated to this court that he has no objection to these dogs barking at intruders for this is their function. Rather, he claims the ordinances are being violated due to the dogs barking for the following reasons:
A) at the moon;
B) at the Greenburgh fire alarm across the street;
C) at the appearance of persons or animals on the outside edge of the fence surrounding the Curry property;
D) at animals, wild or domestic, that intrude within the Curry property.
The issue here is, did the defendant violate the town code ordinances above stated?
Irrespective of the above issue the defendant’s general manager, Michael Heitner, appearing with his attorney at the March 8 hearing, stated, without admitting to violating the ordinances, that if any barking of Curry’s dogs offended the neighbors, he was concerned and desirous of ameliorating their distress.
To that end the complainant McDonald and several of his neighbor witnesses agreed with the court to enter into a stipulation with the defendant to abide a court determination of guilt or innocence while the defendant engaged in the *304 following approaches and techniques to reduce the incidence of barking:
1) screen selected areas of link fence so as to cut off the guard dogs’ view of people or animals near or at the outer edge of the fence;
2) retraining of the dogs in a regimen of restraint from barking at the above-listed nonintrusive possibilities, i.e., the moon;
3) tie two dogs at widely separate areas of the car storage area on 50-foot chains and allow the third dog to roam the enclosure. This is to be done after the retraining takes place.
The time period for retraining and a period of testing the retraining was set for 120 days and thereafter there was a conference held on August 3, 1978 at which the defendants exhibited paid bills of:
1) $1,200, the cost of dog retraining paid to a professional dog trainer;
2) $124.15 for battery powered dog collars at $41.90 each, which collars buzz on a decibel level anguishing to the dogs’ ears if they bark for more than a couple of seconds;
3) $260 paid to Anchor Post Products for additional fencing.
Complainant McDonald acknowledges that although the defendant had apparently carried out the terms of the stipulation, he complained that the dogs still barked and that the fencing work done was not at all inhibitory to the dogs’ barking. The defendant pointed out that it fulfilled more than the stipulation when it purchased and installed on each dog the buzzing dog collars.
Thereupon, the court scheduled and visited the Curry and McDonald premises on August 21, 1978, walking the entire affected areas with Mr. McDonald and neighbors and Mr. Heitner of Curry and his attorney, Mr. Becker.
While at the area, the court stood in the McDonald’s rear yard and the dogs, quiet at the time, were made to bark by their Curry keeper. The court plainly heard them in the yard and then went into the McDonald house, where rear doors and windows open (as in summer), could plainly hear the barking. The barking in the yard area, which is only six or seven feet above the spot the dogs barked from, was loud and clear. The barking was loud and clear inside the house with the doors and windows open. However, the doors and windows *305 were closed and test barking thereupon done. The court found this level of barking quite muted — not at all loud and clear.
The court believes that in the first two instances, if a person will be annoyed at the sound of barking then this level of barking noise will annoy. With the doors and windows shut, the level abates appreciably and should not annoy.
During this visit, the buzzing dog collars were demonstrated on two dogs and apparently worked in that when the buzzer alarm sounded in response to barking, then the dogs ceased barking. However, one of the dog collars’ batteries were dead and this collar was useless. Mr. Heitner acknowledged the defect and stated his men would check more closely to keep the collars working.
The court drove to several homes of the complainant’s witness neighbors and found the deliberately induced barking of the Curry dogs substantially muted by the distance even when standing in the front yard of these addresses.
At the close of the visit the court felt that:
1) defendant had done all he agreed to do in his stipulation;
2) the dogs appeared to be well trained in that they had to be deliberately agitated to bark for test purposes;
3) except at the McDonald premises, the court found the sound of the dogs’ barking to be muted and this objectionable only to someone who responds in annoyance to barking on any level of sound or frequency;
4) the court found the barking loud and clear at the McDonald yard and in their home with windows and doors open. The sound level of same could very definitely be annoying to the McDonalds.
At the conclusion of the visit, Mr. McDonald stated that irrespective of the defendant’s carrying out the stipulation he believed the ameliorating tactics were not sufficient to give his family peace and quiet and he asked the court to rule on the guilt or innocence of the defendant.
The court is now prepared to so rule, although it also states that both sides also agree to be bound by any directions of the court in the future handling of this problem.
The involved town ordinances are penal in nature for conviction can bring about the imposition of substantial fines; such fines may also be renewed and imposed for each day the violation continues. Because of this penal nature, guilt must, by law, be proven beyond a reasonable doubt. The burden of *306 such proof rests upon the complainant, Mr. McDonald, for the defendant is presumed innocent until proven guilty.
Let us now examine the charges:
1) barking at the moon. Complainant states that on occasions during darkness, it was a clear night with a moon and it was his conclusion that the dogs must have been barking at the moon. The defendant replied that this breed of dog does not, by breeding and training, bark at the moon. The complainant could not adduce any more proof than that if was his conjectural conclusion that the dogs barked at the moon. Such charge, not being proven beyond a reasonable doubt, is dismissed.
2) barking at the nearby Greenburgh fire alarm. The Curry property is just across the road from the fire horn. This court, a volunteer fireman himself for over 20 years, is very aware of the high decibel and volume range of these fire horns and is personally aware that all dogs in close proximity to such horns are stirred to barking when such alarm goes off. Such alarm is triggered for a fire response which should not be so frequent as to be annoying. Also the alarm will cause many dogs all over the near area to bark so to use this factor as the basis of a violation by Curry unfairly picks out the guard dogs to the exclusion of any other neighborhood dogs also barking for the same reason. Therefore, the court dismisses this charge as unproved.
3) at the appearance of persons and animals on the outside edge of the fence surrounding the Curry property and
4) at animals wild or domestic, that intrude within the Curry property. These guard dogs are specially trained to bark at intruders and if such gain entrance to the Curry property to hold same at bay and bark until their human master arrives to take charge and arrest the intruders. It was pointed out by the defendant that prior to getting the dogs, Curry lost thousands of dollars in stolen or vandalized equipment and cars. After the dogs arrived, the losses were reduced to incidental amounts.
The dogs are trained to react to intruders and this means people within the compound or at the boundary fence of same. The dogs will bark at any trespass or what appears reasonably in the court’s view to be a trespass. Such trespass can well be beer cans and beer bottles flung over the fence by departing patrons from the bar and grill abutting the north edge of the Curry property. Herein, the court believes that the dogs are *307 responding through their training, for their barking is in furtherance of their protection or preservation of their master’s property.
The court herein refers to the subdivision A of section 2 of chapter 57 of the Town Ordinance, quoted on page — of this decision, which prohibits "Noise [read barking] which annoys, injures or endangers the comfort, repose, health or safety of others, unless the making of same be necessary for the protection or preservation of property or of the health, safety, life or limb of some person.” The court believes that this section construes the totality of the two town noise ordinances.
When these dogs bark at intruders or what appears to be potential intruders on the outside of the chain link fence, they are demonstrating their training and are barking for the protection and preservation of their master’s property. The complainant, Mr. McDonald, admits their function is to protect the property and the court construes that in items 3 and 4 this is, per the clear exemption of the noise ordinances, exactly what they are doing when they bark in those instances. Or, at least the complainant, carrying the burden of proof has not been able to prove beyond a reasonable doubt that these dogs are barking otherwise.
Therefore, it is the decision of this court that the defendant is found not guilty of violating either town ordinances (ch 38, § 4, subd C, or ch 57, § 2, subd B).
However, although the defendant is found not guilty, it is reminded that both sides agreed to be bound, beyond the question of guilt or innocence, with any directions the court may impose.
This court responds empathically and compassionately to the very evident distress of the complainant, Mr. McDonald. The problems here are still vexing ones to the court for Mr. McDonald’s home abuts the dog guard area and, irrespective of their barking being in furtherance of what their training demands, Mr. McDonald still gets the brunt of the sound of barking. There are equities on both sides. The Curry people have the right to continue their business and are in an area zoned commercially for such use.
Mr. McDonald has the misfortune to live in a house, zoned residential, situated at the very edge of the commerical zoning. The court notes that Mr. McDonald was aware of a possible dog barking problem before he purchased his house for he made inquiries before he moved in. After inquiring, he *308 made the decision to buy. Possibly, it would have behooved him, since he was apparently aware of a potential problem, to have raised same to his seller and made renting such property for a month or two a condition of his purchase of the home. However, it is too late now and Mr. McDonald, by rights, should have as little discomfort as is possible from the Curry operation. To that end the court directs Curry to undertake the following measures:
1) remove one dog. Possibly this should be the youngest dog of the three and thereby cut by one third the incidence of barking;
2) maintain the buzzer alarm collars in good operating condition;
3) each year arrange for a renewal of training of the remaining two dogs, so as to keep their trained efficiency at its highest peak;
4) confer with bar and grill proprietor to its north to stop the incidence of thrown beer cans and bottles. If unsuccessful here, there may be legal remedies which can be invoked against such proprietor continuing such nuisance;
5) confer with nearby affected property owners as to the feasibility of other unthought of ameliorating measures. This court will, upon request, review the reasonableness of such measures, by Curry or demands by neighbors.